# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER OF
AMTRUST BANK,

        Plaintiff,

v.

FIRST CENTENNIAL MORTGAGE
CORPORATION, an Illinois
corporation,

        Defendant.

Case No.

Hon.

JAFFE RAITT HEUER & WEISS, P.C.
Ethan Holtz (P71884)
Attorneys for Plaintiff
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
(248) 351-3082 (fax)
eholtz@jaffelaw.com

## COMPLAINT

Plaintiff the Federal Deposit Insurance Corporation as Receiver for AmTrust Bank ("FDIC-R"), for causes of action against Defendant First Centennial Mortgage Corporation ("First Centennial" or "Defendant"), alleges as follows:

## INTRODUCTION

1. This action is brought against First Centennial for its breach of two Master Correspondent Loan Purchase Agreements (collectively, the "Agreements") pursuant to which First Centennial sold or transferred mortgage loans to AmTrust Bank formerly known as Ohio Savings Bank ("AmTrust").

2. First Centennial breached its representations and warranties in the Agreements by providing AmTrust incomplete, inaccurate, false or misleading information regarding six mortgage loans sold or transferred to AmTrust. The FDIC-R files this action to recover the losses caused by First Centennial's breaches.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 12 U.S.C. § 1819(b)(2)(A), because the FDIC-R is a party and therefore this controversy arises under the laws of the United States.

4. This Court has personal jurisdiction over First Centennial because First Centennial is organized under the laws of Ohio, consented to the jurisdiction of Ohio by appointing an agent for service of process in Ohio, and purposefully availed itself of the privilege of conducting activities within Ohio. First Centennial has sufficient minimum contacts with Ohio and the exercise of personal jurisdiction over First Centennial in this action would be reasonable.

5. This Court also has personal jurisdiction over First Centennial pursuant to Ohio's long-arm statute, ORC § 2307.382 because First Centennial is transacting business in

3285840.v1

Ohio; First Centennial contracted to supply services in Ohio; and First Centennial caused injury to AmTrust in Ohio.

6. This Court also has personal jurisdiction over First Centennial pursuant to ORC § 2307.39 because First Centennial agreed that the rights and duties under the Agreements would be governed by the laws of Ohio and submitted to the jurisdiction and venue in any Federal Court located in the City of Cleveland, Ohio. ORC § 2307.39 is applicable to this controversy because the Agreements were not a contract for labor or personal services, or a consumer transaction.

7. The basis for venue in the Northern District of Ohio under 28 U.S.C. § 1391 is that First Centennial is a resident of the State of Ohio, as it is subject to this Court's personal jurisdiction in this action. *See* 28 USC § 1391(c)(2). Venue is also proper in this district because a substantial part of the events or omissions giving rise to the claim occurred in this district because, among other things, the Agreements were entered into by AmTrust in this district, the place of performance for all or some of the obligations sued upon was in this district, and AmTrust suffered damages in this district. Venue is also proper in this district pursuant to the forum selection clause agreed to by First Centennial in the Agreements.

## THE PARTIES

8. The Federal Deposit Insurance Corporation ("FDIC") is a corporation and an instrumentality of the United States of America established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1835(a), and is authorized to be appointed as receiver for insured depository institutions that have failed. AmTrust Bank f/k/a Ohio Savings Bank ("AmTrust") was a federally chartered savings bank with its principal place of business in Cleveland, Ohio. AmTrust was in the business of, among other things, buying and/or funding mortgage loans. On December 4, 2009, the Office of Thrift Supervision closed AmTrust and appointed the FDIC as Receiver for AmTrust pursuant to 12 U.S.C. §§ 1464(d)(2)(A) and 1821(c). The FDIC as Receiver is empowered to sue and complain in

any court of law pursuant to 12 U.S.C. § 1819, and pursuant to 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC-R, by operation of law, succeeded to all of AmTrust's claims. In this action, the FDIC-R seeks to recover damages resulting from the conduct of the Defendant. The FDIC-R owns the subject claims and has standing to prosecute this action as AmTrust's receiver.

9. Defendant First Centennial is an Illinois corporation, with its principal place of business located in Aurora, Illinois. First Centennial is engaged in the business of, among other things, processing, packaging, submitting for funding, selling, and/or transferring loans secured by real property, and is doing business in this district.

## THE AGREEMENTS

### A. The 2002 Agreement

10. In 2002, AmTrust and First Centennial entered into a written contract entitled Master Correspondent Loan Purchase Agreement (hereinafter, "2002 Agreement"). The 2002 Agreement sets forth terms and conditions pursuant to which First Centennial would sell and/or submit and AmTrust would purchase and/or fund mortgage loans.

11. First Centennial made the following representations and warranties to AmTrust with respect to each loan submitted under the 2002 Agreement:

> VI. **REPRESENTATIONS AND WARRANTIES**
>
> 6.1 Representations and Warranties; Mortgage loan. [First Centennial] represents and warrants to [AmTrust], as to each Mortgage Loan to be purchased by [AmTrust] pursuant hereto (as of the Closing Date and the Purchase Date thereof unless otherwise stated), as follows:
>
> > (a) The information contained in the Underwriting Package is complete, true and correct.[1]

---

[1] The 2002 Agreement provides the following definition of "Underwriting Package": "'Underwriting Package' shall mean, with respect to a Mortgage Loan to be purchased under a particular Mortgage Loan Program, the items specified therefore in [AmTrust's] underwriting standards for such Mortgage Loan Program, including without limitation, fully completed and signed loan applications, credit reports, deposit and employment verifications, evidence of income, appraisal, location survey, Federal Truth-in-Lending Act ("TIL") and

> ...
>
> (c) [First Centennial] has not impaired, altered or modified any Mortgage Loan Document in any respect.[2]
>
> ...
>
> (h) The Mortgage Loan and the Mortgage Loan Documents comply with all FNMA and FHLMC underwriting standards and documentation requirements, except as otherwise expressly provided by [AmTrust's] specific Loan Programs.
>
> ...
>
> (p) [First Centennial] has no knowledge of any circumstance or condition with respect to the Mortgage, the Mortgaged Property, the Mortgagor or the Mortgagor's credit standing that might be reasonably expected to cause FNMA, FHLMC or other institutional mortgage loan purchasers to regard the Mortgage Loan as an unacceptable investment, cause the Mortgage Loan to become delinquent or adversely affect the value or marketability of the Mortgage Loan or the Mortgaged Property.
>
> 6.2 Representations and Warranties; Correspondent. [First Centennial] represents and warrants to [AmTrust], as of the date of this Agreement, and on each Closing Date and Purchase Date, as follows:
>
> ...
>
> (k) Neither this Agreement nor any statement, report or other document furnished or to be furnished pursuant to this Agreement or in connection with the transactions contemplated hereby contains any material untrue statement of fact or omits to state a material fact

---

Real Estate Settlement Procedures Act ("RESPA") disclosure documents (acknowledged by Mortgagor), [First Centennial's] approval sheet, and all Loan Documents then available, if any."

[2] The 2002 Agreement provides the following definition of "Mortgage Loan Documents": "the documents creating, evidencing or securing a Mortgage Loan, including without limitation a Mortgage Note, Mortgage, security agreements, appraisals, credit reports, loan applications, loan settlement statements, title insurance policy (or other title evidence acceptable to [AmTrust]), hazard, flood and liability insurance, correspondence and other documents pertaining thereto."

        necessary to make the statements contained herein or therein not misleading.

12.    Regarding First Centennial's repurchase and indemnification obligations, the 2002 Agreement provides:

> 7.1 Repurchase.
>
> (a) Upon ... discovery by [AmTrust] of a breach of any of the representations and warranties contained in Article VI ... then, within sixty (60) days after the earlier of its discovery or its receipt of notice of any such event or occurrence, [First Centennial] shall repurchase said Mortgage Loan at a price equal to the higher of the purchase price or 100% of par, with adjustments for accrued interest, prepayments and any comparable items at the time of repurchase, plus attorney's fees, legal expenses, court costs or other expenses that may have been incurred by [AmTrust] in connection with the Mortgage Loan.
>
> ...
>
> 8.6 [First Centennial] shall indemnify and hold harmless [AmTrust], its shareholders, Directors, officers, agents, attorneys and employees, from and against any and all losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments and other costs and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, (a) a breach of any representation or warranty of [First Centennial] contained in this Agreement; (b) any act or omission of [First Centennial] or any of its partners, directors, members, shareholders, officers, agents or employees in originating or servicing any Mortgage Loan, including, without limitation, incomplete or erroneous loan documentation, fraud by [First Centennial] in the origination of the Mortgage Loan, improper escrow disbursements or misapplied payments or claims not covered by insurance, or violation of applicable law or regulation, (c) [First Centennial's] use of Gemstone; (d) any act or omission of [First Centennial] or any of its partners, directors, members, shareholders, officers, agents, independent contractors or employees in the use of Gemstone or any of the information contained on Gemstone; (e) any unauthorized use of the Gemstone system by [First Centennial] or any of its partners, directors, members, shareholders, officers, agents, independent contractors or employees; or (f) any use of Gemstone by any person or entity using any log-in ID or password assigned to [First Centennial], regardless of whether or not such person or entity has been authorized by [First Centennial] to use such log-in ID or passwords or has exceeded any authority granted by [First Centennial].

13. Pursuant to the provisions contained in the 2002 Agreement, First Centennial sold and/or submitted for funding to AmTrust four of the loans – the Carrington Loans and the Darnell Loans – that are the subject of this action.

**B. The 2007 Agreement**

14. In 2007, AmTrust and First Centennial entered into another written contract entitled Master Correspondent Loan Purchase Agreement (the "2007 Agreement"). The 2007 Agreement also sets forth terms and conditions, pursuant to which First Centennial would sell and AmTrust would purchase mortgage loans.

15. The 2007 Agreement incorporated by reference AmTrust's Seller's Guide, as follows:

> I. **INCORPORATION OF SELLER'S GUIDE ON GEMSTONE**
>
> 1.1 All provisions contained in [AmTrust's] Seller's Guide located on [AmTrust's] Gemstone web-site, as amended or revised from time to time, are hereby incorporated by reference into this Agreement and shall be binding upon the parties. Each change to the Seller's Guide is effective when placed on Gemstone or sent to [First Centennial], whichever first occurs, and is deemed accepted by [First Centennial] by its use of Gemstone thereafter. Specific reference in this Agreement to particular provisions of the Seller's Guide or Gemstone Seller's Guide and not to other provisions does not mean that those provisions of the Seller's Guide or Gemstone not specifically cited herein are not applicable. All terms not otherwise defined herein shall have the same meaning as such terms have in the Seller's Guide unless the context clearly requires otherwise.
>
> 1.2. [First Centennial] acknowledges that they have been provided access to [AmTrust's] Gemstone web-site and the Seller's Guide thereon prior to execution of this agreement and agrees to be bound by and comply with all applicable provisions of the Seller's Guide as amended, supplemented, or revised from time to time by [AmTrust].

16. In the 2007 Agreement, First Centennial made the following representations and warranties to AmTrust with respect to each loan submitted under the 2007 Agreement:

> VII. **REPRESENTATIONS AND WARRANTIES**
>
> 7.1 <u>Representations and Warranties; Mortgage loan</u>. [First Centennial] hereby incorporates by reference all representations and warranties set

forth in the Seller's Guide and in the Agreement (collectively the "Reps") and represents and warrants to [AmTrust], as to each Mortgage Loan to be purchased by [AmTrust] pursuant hereto (as of the Closing Date and the Purchase Date thereof unless otherwise stated), that such Mortgage Loan complies in all respects with the Reps as then set forth in this Agreement and the Seller's Guide at the time of the purchase of such Mortgage Loan by [AmTrust], which includes any and all additional representations and warranties added to the Seller's Guide after the effective date of this Agreement.

...

7.2 <u>Representations and warranties; Correspondent</u>. [First Centennial] represents and warrants to [AmTrust], as of the date of this Agreement, and on each Closing Date and Purchase Date, as follows:

...

(k) Neither this Agreement nor any statement, report or other document furnished or to be furnished pursuant to this Agreement or in connection with the transactions contemplated hereby contains any material untrue statement of fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading.

17. Pursuant to the incorporated Seller's Guide, [First Centennial] made the following additional representations and warranties:

1.3 Representations and Warranties

1.3.1 [First Centennial] has complied with all applicable requirements in the origination of the mortgage loan as set forth in this Seller's Guide and the Agreement.

1.3.2 The information contained in the underwriting package or otherwise used to underwrite and approve the mortgage loan is complete, true and correct.

...

1.3.4 [First Centennial] has not taken any action, or failed to take any action that has impaired, altered, or modified any Mortgage Loan Document in any respect.[3]

...

1.3.9 The Mortgage Loan and the Mortgage Loan Documents comply with all Fannie Mae and FREDDIE MAC underwriting

---

[3] "Mortgage Loan Documents" is defined the same as in the 2002 Agreement.

3285840.v1

standards and documentation requirements, except as otherwise expressly provided by AmTrust's specific Loan Programs as set forth on Gemstone.

...

1.3.17 [First Centennial] has no knowledge of any circumstance or condition with respect to the Mortgage, the Mortgaged Property, the Mortgagor or the Mortgagor's credit standing that might be reasonably expected to cause Fannie Mae, FREDDIE MAC or other institutional mortgage loan [purchasers] to regard the Mortgage Loan as an unacceptable investment, cause the Mortgage Loan to become delinquent or adversely affect the value or marketability of the Mortgage Loan or the Mortgaged Property.

18. Section 8.3 of the 2007 Agreement further confirmed First Centennial was responsible for the truth, accuracy, and completeness of all loan application documents:

8.3 It is contemplated that certain loans sold hereunder may be underwritten by [AmTrust] or [AmTrust's] approved contract underwriter before purchase. In those cases only, [First Centennial] is relieved of its duties and obligations regarding the underwriting and any obligation to repurchase due solely to underwriting errors or improper underwriting decisions, unless such underwriting errors or improper underwriting decisions are based in whole or in part upon (i) incomplete or inaccurate information, false statements, or fraudulent underwriting or loan application documentation provided by the [First Centennial] or any other party providing information used in the loan processing or loan application underwriting process, or (ii) inaccurate Reps. *The accuracy, completeness, validity and authenticity of all loan application documents provided to, or required to be provided to, [AmTrust] to conclude the underwriting decision are exclusively and solely the responsibility of [First Centennial] as set forth in the Reps upon which [AmTrust] is intended to rely in originating Mortgage Loans. [First Centennial] remains responsible to insure that all conditions called for in the underwriting approved by [AmTrust] are satisfied and that all information submitted in the loan application and throughout the underwriting and funding process is true, correct and complete.*

(Emphasis added.)

19. Regarding First Centennial's repurchase and indemnification obligations, the 2007 Agreement provides:

> 8.1 Repurchase.
>
> (a) [First Centennial] agrees that upon written request [First Centennial] shall repurchase, at the Repurchase Price as set forth in the Seller's Guide, any Mortgage Loan sold to [AmTrust] pursuant to this Agreement for any of the following reasons:
>
>> (i) [AmTrust] determines that [First Centennial] failed to deliver to [AmTrust] the proper Mortgage Loan Documents pursuant to this Agreement and the Seller's Guide.
>>
>> (ii) [AmTrust] determines there is any evidence of fraud in the origination and/or closing of the Mortgage Loan by x) [First Centennial] or its employees, directors, officers, agents, vendors, service providers and independent contractors (including without limitation, sellers or brokers of the [First Centennial] and settlement agents); or y) the Borrower.
>>
>> …
>>
>> (iv) [AmTrust] determines that [First Centennial] failed to observe or perform, or breached, in any material respect any of the representations, warranties or agreements contained in this Agreement, the Seller's Guide, or Agency guidelines with respect to a particular Mortgage Loan.
>>
>> …
>
> 9.4 (a) [First Centennial] hereby agrees to indemnify and hold harmless [AmTrust], its successors and/or assigns, from any and all losses, liabilities, claims, damages, or costs of any nature, including without limitation attorneys' fees and costs, and actions suffered or incurred by [AmTrust] which arise out of, result from, or relate to: i) The breach by [First Centennial] of any covenant, condition, term, obligation, representation or warranty contained in this Agreement, the Seller's Guide, or in any written statement, certificate, or Mortgage Loan Document furnished by the [First Centennial] pursuant to this Agreement or the Seller's Guide; or ii) any act or omission of [First Centennial] or any employee, vendor, service provider or agent of [First Centennial] which adversely affects any Mortgage

> Loan registered with and funded by [AmTrust] hereunder. This indemnification shall survive any termination or cancellation of this Agreement.
>
> (b) Without limiting the foregoing paragraph, [First Centennial's] obligation to indemnify [AmTrust] under this Agreement shall include reimbursing [AmTrust] for the costs and expenses associated with [AmTrust's] efforts to require [First Centennial] to repurchase Mortgage Loans. ...

20. Pursuant to the provisions contained in the 2007 Agreement, First Centennial sold and/or submitted for funding to AmTrust two of the loans – the Bush Loan and the Gomez Loan – that are the subject of this action.

## COUNT I: BREACH OF CONTRACT
### (for the Carrington Loans)

21. Plaintiff FDIC-R realleges paragraphs 1 through 13, as if fully set forth herein.

22. Pursuant to the 2002 Agreement, in or about February 2007, AmTrust purchased and/or funded two loans totaling $192,852 (a first mortgage loan of $154,281 and a second mortgage loan of $38,751) to borrower David Carrington, secured by property located in Cortland, Illinois (the "Carrington Loans").

23. AmTrust purchased and/or funded the Carrington Loans, pursuant to the terms of the 2002 Agreement, for valuable consideration and in reliance upon the representations and warranties made by First Centennial in the 2002 Agreement.

24. In breach of the representations and warranties that First Centennial made to AmTrust in the 2002 Agreement, the information contained in the Carrington Loans Underwriting Package was incomplete, untrue, and incorrect by, among other things: misrepresenting the borrower's income.

25. The Carrington Loans defaulted.

26. Starting on or about October 14, 2013, Plaintiff demanded that First Centennial perform its obligations under the 2002 Agreement with regard to the Carrington Loans, including but not limited to its indemnification obligations. First Centennial failed

3285840.v1

and refused to indemnify Plaintiff for its losses relating to the Carrington Loans or otherwise perform under the 2002 Agreement.

27. First Centennial failed to perform its obligations under the 2002 Agreement with respect to the Carrington Loans.

28. AmTrust and the FDIC-R performed all of their obligations to First Centennial under the 2002 Agreement with respect to the Carrington Loans, except any obligations AmTrust and the FDIC-R have been prevented or excused from performing by the acts and breaches of First Centennial.

29. As a result of First Centennial's breach of the 2002 Agreement, including, but not limited to, its failure to perform its obligations under the 2002 Agreement, damages were suffered in an amount to proven at trial. Thus, the FDIC-R is entitled to damages, plus interest, and attorneys' fees and costs under the Agreement.

## COUNT II: BREACH OF CONTRACT
### (for the Darnell Loans)

30. Plaintiff FDIC-R realleges paragraphs 1 through 13, as if fully set forth herein.

31. Pursuant to the 2002 Agreement, in or about February 2007, AmTrust purchased and/or funded two loans totaling $343,000 (a first mortgage loan of $256,000 and a second mortgage loan of $87,000) to borrower Patricia Darnell, secured by property located in Yorkville, Illinois (the "Darnell Loans").

32. AmTrust purchased and/or funded the Darnell Loans, pursuant to the terms of the 2002 Agreement, for valuable consideration and in reliance upon the representations and warranties made by First Centennial in the 2002 Agreement.

33. In breach of the representations and warranties that First Centennial made to AmTrust in the 2002 Agreement, the information contained in the Darnell Loans Underwriting Package was incomplete, untrue, and incorrect by, among other things: misrepresenting the borrower's income.

34. The Darnell Loans defaulted.

35.     Starting on or about December 18, 2014, Plaintiff demanded that First Centennial perform its obligations under the 2002 Agreement with regard to the Darnell Loans, including but not limited to its indemnification obligation. First Centennial failed and refused to indemnify Plaintiff for losses relating to the Darnell Loans or otherwise perform under the 2002 Agreement.

36.     First Centennial failed to perform its obligations under the 2002 Agreement with respect to the Darnell Loans.

37.     AmTrust and the FDIC-R performed all of their obligations to First Centennial under the 2002 Agreement with respect to the Darnell Loans, except any obligations AmTrust and FDIC-R have been prevented or excused from performing by the acts and breaches of First Centennial.

38.     As a result of First Centennial's breach of the 2002 Agreement, including, but not limited to, its failure to perform its obligations under the 2002 Agreement, damages were suffered in an amount to proven at trial. Thus, the FDIC-R is entitled to damages, plus interest, and attorneys' fees and costs under the Agreement.

### COUNT III: BREACH OF CONTRACT
### (for the Bush Loan)

39.     Plaintiff FDIC-R realleges paragraphs 1 through 9 and paragraphs 14 through 20, as if fully set forth herein.

40.     Pursuant to the 2007 Agreement, in or about February 2008, AmTrust purchased and/or funded a $112,000 loan to borrower Nicholas Bush, secured by property located in Ottawa, Illinois (the "Bush Loan").

41.     AmTrust purchased and/or funded the Bush Loan, pursuant to the terms of the 2007 Agreement, for valuable consideration and in reliance upon the representations and warranties made by First Centennial in the 2007 Agreement and incorporated Seller's Guide.

42.     In breach of the representations and warranties that First Centennial made to AmTrust in the 2007 Agreement and incorporated Seller's Guide, the information contained in the Bush Loan underwriting package was incomplete, untrue, and incorrect by, among

3285840.v1

other things: misrepresenting the history of the property securing the Bush Loan, misrepresenting that the Bush Loan was a mortgage refinance loan, and misrepresenting that the Bush Loan qualified and was eligible for delivery to AmTrust when it was not.

43. The Bush Loan defaulted.

44. Staring on or about October 14, 2013, Plaintiff demanded that First Centennial perform its obligations under the 2007 Agreement with regard to the Bush Loan, including but not limited to its indemnification obligation. First Centennial failed and refused to indemnify Plaintiff for losses relating to the Bush Loan or otherwise perform under the 2007 Agreement and incorporated Seller's Guide.

45. First Centennial failed to perform its obligations under the 2007 Agreement with respect to the Bush Loan.

46. AmTrust and the FDIC-R performed all of their obligations to First Centennial under the 2007 Agreement with respect to the Bush Loan, except any obligations AmTrust and FDIC-R have been prevented or excused from performing by the acts and breaches of First Centennial.

47. As a result of First Centennial's breach of the 2002 Agreement, including, but not limited to, its failure to perform its obligations under the 2002 Agreement, damages were suffered in an amount to proven at trial. Thus, the FDIC-R is entitled to damages, plus interest, and attorneys' fees and costs under the Agreement.

## COUNT IV: BREACH OF CONTRACT
### (for the Gomez Loan)

48. Plaintiff FDIC-R realleges paragraphs 1 through 9 and paragraphs 14 through 20, as if fully set forth herein.

49. Pursuant to the 2007 Agreement, in or about December 2007, AmTrust purchased and/or funded a $198,000 loan to borrower Nicolas Gomez, secured by property located in Aurora, Illinois (the "Gomez Loan").

50. AmTrust purchased and/or funded the Gomez Loan, pursuant to the terms of the 2007 Agreement, for valuable consideration and in reliance upon the representations and warranties made by First Centennial in the 2007 Agreement and incorporated Seller's Guide.

51. In breach of the representations and warranties that First Centennial made to AmTrust in the 2007 Agreement and incorporated Seller's Guide, the information contained in the Gomez Loan underwriting package was incomplete, untrue, and incorrect by, among other things: misrepresenting the borrower's debt obligations.

52. The Gomez Loan defaulted.

53. Staring on or about December 24, 2014, Plaintiff demanded that First Centennial perform its obligations under the 2007 Agreement with regard to the Gomez Loan, including but not limited to its indemnification obligation. First Centennial failed and refused to indemnify Plaintiff for losses relating to the Gomez Loan or otherwise perform under the 2007 Agreement.

54. First Centennial failed to perform its obligations under the 2007 Agreement with respect to the Gomez Loan.

55. AmTrust and the FDIC-R performed all of their obligations to First Centennial under the 2007 Agreement with respect to the Gomez Loan, except any obligations AmTrust and FDIC-R have been prevented or excused from performing by the acts and breaches of First Centennial.

56. As a result of First Centennial's breach of the 2002 Agreement, including, but not limited to, its failure to perform its obligations under the 2002 Agreement, damages were suffered in an amount to proven at trial. Thus, the FDIC-R is entitled to damages, plus interest, and attorneys' fees and costs under the Agreement.

## RELIEF REQUESTED

WHEREFORE, Plaintiff FDIC-R respectfully requests that:

A. The Court find Defendant First Centennial liable for its breaches of contract, and enter judgment for any and all remedies available under the contract or by operation of

law including without limitation: damages, attorney's fees, costs, expenses, interest, and other such relief the Court may deem appropriate under the circumstances.

      B.      The Court award costs and disbursements and order such other and further relief, including equitable relief, that is just and proper.

Date: December 3, 2015        Respectfully submitted,

**JAFFE RAITT HEUER & WEISS, P.C.**

By: /s/ Ethan R. Holtz
Ethan R. Holtz (P71884)
27777 Franklin Road
Southfield, MI. 48034
(248) 351-3000
Eholtz@jaffelaw.com
Attorneys for Plaintiff, Federal Deposit Insurance Corporation as Receiver for AmTrust Bank